## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**TEMPLE UNIVERSITY HOSPITAL, INC.,**

                  **Plaintiff,**

**v.**

**ALEX M. AZAR II, SECRETARY, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, et al.,**

                  **Defendants.**

**Civil Action No. 20-4533-MSG**

Goldberg, J.                                                                                              February 8, 2021

### MEMORANDUM OPINION

This case involves a dispute over a regulatory decision made by Defendant, the Secretary of Health and Human Services. That decision affects Plaintiff Temple University Hospital, Inc.'s classification to a particular geographic area for purposes of certain Medicare reimbursement, including designation of that area's wage index. The parties have filed cross-motions for summary judgment. For the following reasons, I will grant Defendant's Motion, deny Plaintiff's Motion, and enter judgment in favor of Defendant.

## I.    FACTUAL AND REGULATORY BACKGROUND

### A.    Regulatory Background

The Medicare program is a system of health insurance for the aged and disabled. (DSUF ¶ 1; PR ¶ 1.) [1] Unless exempt, hospitals that participate in Medicare are reimbursed for inpatient

---

[1]    References to the parties' pleadings will be made as follows: Plaintiff's Statement of Undisputed Facts ("PSUF"); Defendants' Response ("DR"); Defendants' Statement of Undisputed Facts ("DSUF"); and Plaintiff's Response ("PR"). To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions. If a statement is disputed and can be resolved

services provided to Medicare beneficiaries under an inpatient prospective payment system. (DSUF ¶ 2; PR ¶ 2.)  A hospital's reimbursement under the inpatient prospective payment system varies in part based on the hospital's location.  (DSUF ¶ 3; PR ¶ 3.)  A hospital's reimbursement rate for each patient with a particular diagnosis is computed by adjusting the appropriated "standardized" amount by a "wage index"—a multiplier to account for area wage differences. (DSUF ¶ 4; PR ¶ 4.)

The wage index is a factor reflecting the relative hospital wage level in the geographic area of a hospital compared to the national average hospital wage level.  (DSUF ¶ 5; PR ¶ 5); 42 U.S.C. § 1395ww(d)(3)(E).  Wage indexes vary widely throughout a given region and have a direct impact on the amount of a reimbursement a hospital receives—the higher the wage index for the area in which the hospital is located, the more a hospital will be reimbursed per Medicare patient.  (DSUF ¶ 6; PR ¶ 6.)  In calculating wage indexes, the Secretary of Health and Human Services ("the Secretary") defines hospital labor markets according to the definitions of Core-Based Statistical Areas ("Statistical Areas")[2] promulgated by the Office of Management and Budget ("OMB").[3] (DSUF ¶ 7; PR ¶ 7.)

---

by reference to the regulations or exhibits, I will cite the supporting regulation or exhibits.  I will also cite to the supporting regulation or exhibits in the event further clarification of a fact is required.

[2]     A "Core Based Statistical Area" is defined as "a geographic entity associated with at least one core of 10,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties.  The standards designate and define two categories of [Statistical Areas]:  Metropolitan Statistical Areas and Micropolitan Statistical Areas."  65 Fed. Reg. 82,228, 82,235–36 (2000).

[3]     The Office of Management and Budget oversees the performance of federal agencies, and administers the federal budget.  https://www.usa.gov/federal-agencies/office-of-management-and-budget (last visited 1/25/21).

Periodically, in response to data gathered during the decennial census, OMB updates the definitions and geographical boundaries of Statistical Areas.  (DSUF ¶ 8; PR ¶ 8.)  After evaluating the impact of those changes on the Medicare program, the Secretary typically adopts OMB's changes to Statistical Areas through the rulemaking process.  (DSUF ¶ 9; PR ¶ 9); Medicare Program; changes to the Hospital Inpatient Prospective Payment System, 69 Fed. Reg. 48,916-01, 49,027 (Aug. 11, 2004).

In 1989, Congress established the Medicare Geographic Classification Review Board ("Review Board") to provide a mechanism for hospitals to apply for reclassification from the area in which they are located to another area for certain Medicare reimbursement purposes, including receipt of the other area's wage index.  42 U.S.C. § 1395ww(d)(10).  To obtain reclassification, a hospital must generally prove: (1) its wages are higher than other hospitals in the area in which it is located; (2) its wages are comparable to other hospitals in the area to which it seeks to be reclassified; and (3) it can demonstrate close proximity to the area to which it seeks redesignation by meeting certain criteria.  42 C.F.R. § 412.230.  Congress empowered the Review Board to decide whether to grant any hospital's application requesting to change its geographic classification to a new geographic area.  (DSUF ¶ 11; PR ¶ 11.)  Review Board decisions on initial reclassification applications may be appealed to Defendant Secretary of Health and Human Services ("Secretary"), but the Secretary's decision regarding appeals "shall be final and shall not be subject to judicial review."  42 U.S.C. § 1395ww(d)(10)(C)(iii)(II).

In 2000, Congress, enacted additional legislation regarding the duration of a decision to reclassify a hospital for wage index purposes.  This provision, the "Three-Year Reclassification Decision Provision," states:

> Any decision of the Board to reclassify a subsection (d) hospital for purposes of the adjustment factor described in subparagraph

(C)(i)(II) for fiscal year 2001 or any fiscal year thereafter shall be effective for a period of 3 fiscal years, except that the Secretary shall establish procedures under which a subsection (d) hospital may elect to terminate such reclassification before the end of such period.

42 U.S.C. § 1395ww(d)(10)(D)(v).

###    B.    Facts Relevant to this Case

For the most part, the following facts are undisputed.

On September 14, 2018, OMB updated definitions and geographic boundaries of certain Statistical Areas. (DSUF ¶ 16; PR ¶ 16.) Among other changes, OMB altered the geographic area designated as the New York-Jersey City-White Plains, NY-NJ Statistical Area 35614 by removing three of its constituent counties (Middlesex County, NJ; Monmouth County, NJ; and Ocean County, NJ), and combining them with a fourth county (Somerset County, NJ) to create a newly-constituted New Brunswick-Lakewood Statistical Area 35154.2. (DSUF ¶ 17; PR ¶ 17.)

Plaintiff Temple University Hospital ("Temple") is located in Philadelphia, Pennsylvania and participates in the Medicare program. (DSUF ¶ 18; PR ¶ 18.) For purposes of the Medicare wage index, Temple is treated as being geographically located in the Pennsylvania rural wage area. (PSUF ¶ 5; DR ¶ 5.) On September 3, 2019, Temple applied to the Review Board to be reclassified to the New York-Jersey City-White Plains, NY-NJ Statistical Area 35614 effective for Fiscal Years 2021 through 2023 (October 1, 2020 through September 20, 2023). (PSUF ¶ 6; DR ¶ 6.) To meet the reclassification proximity requirement, Temple was required to be thirty-five miles from Monmouth County, which at the time was part of the New York-Jersey City-White Plains, NY-NJ Statistical Area. (PSUF ¶ 8; DR ¶ 8.) Temple met those reclassification requirements and, in a February 21, 2020 decision, the Review Board approved Temple's reclassification application to the New York-Jersey City-White Plains, NY-NJ Statistical Area beginning in Fiscal Year 2021. (PSUF ¶¶ 7,9; DR ¶¶ 7,9.)

4

In the Fiscal Year 2021 Hospital Inpatient Proposed Rule—published in the May 29, 2020 Federal Register—the Centers for Medicare & Medicaid Services[4] proposed adopting the newest OMB geographic delineation changes. These changes included the redefinition of the New York-Jersey City-White Plains NY-NJ Statistical Area 35614 and the creation of the New Brunswick-Lakewood Statistical Area 35154. See FY 2021 IPPS Proposed Rule, 85 Fed. Reg. 32,460, 32,696-97 (proposed May 29, 2020). OMB's delineation changes were subsequently adopted in the Fiscal Year 2021 Hospital Inpatient Final Rule ("Final Rule"). (PSUF ¶ 11; DR ¶ 11); Medicare Program, Hospital IPPS for Acute Care Hospitals, 85 Fed. Reg. 58,432, 58,746 (Sept. 18, 2020). Although the use of OMB delineations is not mandated by Congress, the Secretary's voluntary adoption of OMB's geographic delineations has been approved by Congress. 85 Fed. Reg. at 58,745; 42 U.S.C. § 1395ww(d)(10)(D)(ii).

Under the Secretary's new geographic delineations, many hospitals that had previously been approved for reclassification to newly-redefined Statistical Areas were no longer eligible to be assigned to those Statistical Areas. To accommodate both these individual reclassification decisions and the new Statistical Areas definitions that removed and shifted counties, the Secretary adopted the following regulation:

> Consistent with the policy [the Centers for Medicare and Medicaid Services] implemented in the FY 2005 IPPS final rule . . . and in the FY 2015 IPPS final rule . . ., for FY 2021, if a [Statistical Area] would be reconfigured due to adoption of the revised OMB delineations and it would not be possible for the reclassification to continue seamlessly to the reconfigured [Statistical Area], we believe it would be appropriate for us to determine the best alternative location to reassign current reclassifications for the remaining 3 years. Therefore, to maintain the integrity of a hospital's 3-year reclassification period, we are proposing that

---

[4]     The Centers for Medicare & Medicaid Services is a component of HHS to which the Secretary delegates responsibility for day-to-day administration of the Medicare program. https://www.cms.gov/ (last visited 1/25/21).

current geographic reclassifications (applications approved effective for FY 2019, FY 2020, or FY 2021) that would be affected by [Statistical Areas] that are split apart or counties that shift to another [Statistical Area] under the revised OMB delineations, would ultimately be assigned to a [Statistical Area] under the revised OMB delineations that contains at least one county from the reclassified [Statistical Area] under the current FY 2020 definitions, and would be generally consistent with rules that govern geographic reclassification. That is, consistent with the policy finalized in FY 2015 . . ., we are proposing a policy that affected reclassified hospitals be assigned to a [Statistical Area] that would contain the most proximate county that—(1) is located outside of the hospital's proposed FY 2021 geographic labor market area, and (2) is part of the original FY 2020 [Statistical Area] to which the hospital is reclassified.

Medicare Program, Hospital IPPS for Acute Care Hospitals, 85 Fed. Reg. 32460–01, 32,717 (May 29, 2020). Under this proposed reclassification assignment policy, Temple—which had originally received a reclassification decision based on its proximity to Monmouth County—would move to the New Brunswick-Lakewood Statistical Area 35154. (DSUF ¶ 28; PR ¶ 28.)

Temple contacted the Centers for Medicare & Medicaid Services about the proposed Fiscal Year 2021 rule and its impact on Temple. (PSUF ¶ 20; DR ¶ 20; Declaration of Michael Young ("Young Decl.") ¶ 7.) Temple also submitted comments about the Proposed Rule. (PSUF ¶ 21; DR ¶ 21.) Neither the Secretary nor the Centers for Medicare & Medicaid Services would confirm that Temple would be reclassified for three years to the New York-Jersey City-White Plains, NY-NJ Statistical Area.[5] (Young Decl. ¶ 7.)

---

[5] For Fiscal Year 2021, the wage index in the New York-Jersey City-White Plains NY-NJ Statistical Area is 1.3239. (Young Decl. ¶ 4.) The wage index in the newly-created New Brunswick-Lakewood, NJ Statistical Area is 1.0754. (Id.) The wage index in the Vineland-Bridgeton, NJ is 1.1224. (Id.) For each of the next three years, Temple's total Medicare reimbursement in the New York-Jersey City-White Plains, NY-NJ Statistical Area would be approximately $45,000,000 more than Temple would receive in the newly created New Brunswick-Lakewood, NJ, and approximately $30,000,000 more than Temple would receive in the Vineland-Bridgeton, NJ Statistical Area. (Id. & Ex. 3.)

The Centers for Medicare & Medicaid Services proposed several "budget neutral transition policies to help mitigate negative impacts on hospitals of certain wage index proposals." (PSUF ¶ 23 (quoting 85 Fed. Reg. at 32,706); DR. 23.) For example, the Centers for Medicare & Medicaid Services applied a five percent cap on the amount a hospital's wage index could decrease from its wage index for the prior year (Fiscal Year 2020). (PSUF ¶ 24; DR ¶ 24.) The cap, however, did not alleviate any burden on Temple because Temple was not facing any decrease from the previous year. Temple was simply not going to receive its approved and expected reclassification to the higher wage index of New York-Jersey City-White Plains, NY-NJ Statistical Area. (PSUF ¶ 25; DR ¶ 25.) Moreover, the Centers for Medicare & Medicaid Services proposed that affected hospitals could submit a request to be reassigned to a different Statistical Area, but that Statistical Area must contain a county that was part of the original Statistical Area to which the hospital was reclassified. (PSUF ¶ 26; DR. ¶ 26.)

As part of its response to the Proposed Rule, and in an effort to mitigate its potential losses, Temple requested that it be reclassified to the Atlantic City-Hammonton, NJ Statistical Area 12100, rather than the newly-created New Brunswick-Lakewood, NJ Statistical Area. That request was not approved. (PSUF ¶ 27; DR ¶ 27.)

Thereafter, on September 14, 2020, Temple submitted an application to the Review Board to be reclassified to the Vineland-Bridgeton, NJ Statistical Area for Fiscal Years 2022 through 2024. (PSUF ¶ 28; DR ¶ 28.) Although the wage index and Medicare Reimbursement for the Vineland-Bridgeton, NJ Statistical Area is less than that of the New York-Jersey City-White Plains, NY-NJ Statistical Area, it is higher than the New Brunswick-Lakewood, NJ Statistical Area to which Temple is currently assigned.

On September 16, 2020, Temple filed the current suit alleging that the Secretary's regulatory scheme is unlawful. The parties agreed to proceed directly to summary judgment briefing.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the Administrative Procedure Act, the usual Rule 56 summary judgment standard does not apply due to the limited role of a court in reviewing the administrative record. Dorley v. Cardinale, 119 F. Supp. 3d 345, 351 (E.D. Pa. 2015).

Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, id. § 706(2)(C), or "without observance of procedures required by law," id. § 706(2)(D); see also 42 U.S.C. § 1395oo(f)(1). The scope of review is narrow, and a court must not "substitute its judgment for that of the agency." See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Nonetheless, the reviewing court must be satisfied that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a 'rational connection between the facts found and the choice made.'" CBS Corp. v. Fed. Commc'ns Comm'n, 663 F.3d 122, 137 (3d Cir. 2011) (quoting State Farm, 463 U.S. at 43).

Reversal of an agency's action "is appropriate only where the administrative action is irrational or not based on relevant factors." NVE, Inc. v. Dep't of Health & Human Servs., 436 F.3d 182, 190 (3d Cir.2006) In determining whether an agency acted arbitrarily and capriciously,

a district court examines "whether the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence." Id. Additionally, a reviewing court must look at the reasons articulated by the agency itself at the time of the decision rather than post-hoc rationalizations. State Farm, 463 U.S. at 50.

## III.    DISCUSSION

Temple challenges the Secretary's regulatory scheme and the policy of the Secretary to geographically reassign a hospital to a new Statistical Area even if the hospital has obtained a reclassification decision that is valid for three years.

In Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842–44, the Supreme Court of the United States articulated a two-step inquiry for determining the level of deference a court should give an agency's interpretation of its enabling statute.  First, the court must ask "whether Congress has directly spoken to the precise question at issue." Id. at 842.  If congressional intent is clear, the inquiry ends and both the court and the agency "must give effect to the unambiguously expressed intent of Congress." Id. at 842–43.  At the first step, the Supreme Court has instructed that courts must consider not only the plain language of the statute, but also, through "traditional tools of statutory construction," whether "Congress had an intention on the precise question at issue." Chevron, 467 U.S. at 843 n.9; see Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor, 745 F.3d 653, 670 (3d Cir. 2014).

Second, if the statute is ambiguous, the court must decide whether the agency's interpretation of the statute is "a permissible construction." Id. at 843.  Chevron deference extends only to "agency action promulgated in the exercise of congressionally-delegated authority to make rules carrying the force of law." De Leon–Ochoa v. Att'y Gen. of U.S., 622 F.3d 341, 348 (3d

Cir. 2010) (citing <u>U.S. v. Mead Corp.</u>, 533 U.S. 218, 226–227 (2001)). As such, policies, manuals, and guidelines that set forth agency interpretations are not entitled to <u>Chevron</u> deference. <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000). The same holds true for interpretive guidelines and statements of policy. <u>Madison v. Res. for Hum. Dev., Inc.</u>, 233 F.3d 175, 186 (3d Cir. 2000); <u>Chao v. Rothermel</u>, 327 F.3d 223, 227 (3d Cir. 2003).

When evaluating an agency decision that does not carry the force of law, courts apply a lesser degree of deference pursuant to <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944). <u>See</u> <u>Hagans v. Comm'r of Soc. Sec.</u>, 694 F.3d 287, 294–95 (3d Cir. 2012). <u>Skidmore</u> provides that agency interpretations are "entitled to respect" based on their "power to persuade." <u>Madison</u>, 233 F.3d at 186 (quoting <u>Christensen</u>, 529 U.S. at 587). In order to gauge the persuasiveness of a particular agency decision, a court must examine "the thoroughness evident in [the agency's] consideration [and] the validity of its reasoning." <u>Skidmore</u>, 323 U.S. at 140. Above all, a court must consider whether the agency's interpretation is consistent with other agency action, and reasonable, based on the "language and purpose" of the statute in question. <u>See</u> <u>Del. Dep't of Nat'l Res. & Env't Control v. U.S. Army Corps of Eng'rs</u>, 685 F.3d 259, 284 (3d Cir. 2012) (quoting <u>Cleary ex rel. Cleary v. Waldman</u>, 167 F.3d 801, 808 (3d Cir. 1999)).

Temple now contends that the Secretary's regulations and policies are invalid under both step one and step two of the <u>Chevron</u> analysis. I will analyze each prong individually.

### A.    <u>Step One of the *Chevron* Analysis</u>

Temple's primary argument presses that the Three-Year Reclassification Decision Provision contains Congress' clear and unambiguous mandate as to where and for how long a hospital with an approved wage index reclassification is to be reclassified:

> Any decision of the Board to reclassify a subsection (d) hospital for purposes of the adjustment factor described in subparagraph

> (C)(i)(II) for fiscal year 2001 or any fiscal year thereafter **shall** be
> effective for a period for **3 fiscal years**, except that the Secretary
> shall establish procedures under which a subsection (d) hospital may
> elect to terminate such reclassification before the end of such period.

42 U.S.C. § 1395ww(d)(10)(D)(v) (emphasis added). Relying on this statute, Temple posits that

once it was approved by the Review Board to be reclassified to the New York-Jersey City-White

Plains, NY-NJ Statistical Area 35614, the reclassification decision had to be honored for three

years. Temple avers that the mandatory nature of this provision is evidenced by use of the phrase

"*shall* be effective for a period of 3 fiscal years." Id. (emphasis added). Temple contends that the

clear and unambiguous meaning of the statute is that once a reclassification application is

approved, the Secretary does not have discretion to change that reclassification for a three-year

period. In turn, Temple concludes that any current effort by the Secretary to eliminate that

Statistical Area and reclassify Temple to a new geographic location is improper. (See Temple's

Mot. Summ. J. 17 (arguing that the Three-Year Reclassification Decision Statute "protects

hospitals for three years from subsequent action by the Secretary to undermine or change an

approved reclassification.").)

The Secretary rejects any notion that its redefinition of the New York-Jersey City-White

Plains, NY-NJ Statistical Area 35614 and creation of the New Brunswick-Lakewood Statistical

Area 35154—to which Temple was subsequently assigned—constituted either a termination of

Temple's approved reclassification or a new "reclassification decision" under the statute. Rather,

the Secretary asserts that the Review Board's decision reclassifying Temple to Statistical Area

35614 was based on the geographic limits of that Statistical Area as it existed at the time of the

decision, with the inclusion of fourteen counties in New York and New Jersey. The Secretary

reasons that (a) following the Fiscal Year 2021 rulemaking, that particularly-defined New York-

Jersey City-White Plains, NY-NJ Statistical Area no longer exists, (b) Monmouth County (on

which Temple premised its qualification for reclassification) is now part of the newly-created New Brunswick-Lakewood, NJ Statistical Area 35154, and (c) Temple does not meet the regulatory criteria in 42 C.F.R. § 412.230(b) to be included in the newly–redrawn New York-Jersey City-White Plains, NY-NJ Statistical Area 35614.  Given these facts, the Secretary concludes that the Three-Year Reclassification Decision Provision, 42 U.S.C. § 1395ww(d)(10)(D)(v), does not protect hospitals for three years from any subsequent action by the Secretary to render inoperative a geographic reclassification decision arrived at through the Review Board process.

Step one of the Chevron analysis requires that I weigh these competing interpretations and decide whether the statutory scheme unambiguously addresses the resolution of the situation.  As noted above, the goal when interpreting a statute is to effectuate Congress' intent.  Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 295 (3d Cir. 2012).  "Because we presume that Congress' intent is most clearly expressed in the text of the statute, we began our analysis with an examination of the plain language of the relevant provision."  Id. (quoting Reese Bros, Inc. v. U.S., 447 F.3d 229, 235 (3d Cir. 2006)).  The entire scope of the relevant statute must be considered when attempting to divine congressional intent.  Id.  When a statute is "'complex and contains many interrelated provisions,' it may be 'impossible to attach a plain meaning to provisions in isolation.'"  Id. at 296 (quoting Clearly ex rel. Cleary v. Waldman, 167 F.3d 801, 807 (3d Cir. 1999).  The United States Court of Appeals for the Third Circuit has explicitly recognized that the Medicare statute constitutes such a complex statute, often rendering it "ambiguous."  Cleary, 167 F.3d at 807.

A closer look at the statutory language here bears out the complexity—and, in turn, the ambiguity—of the particular Medicare provision at issue here.  The Medicare statute requires the Secretary to adjust payments to hospitals to account for area differences in hospital wage levels

"by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i). Because the geographic classification procedures can impose a burden on some hospitals, such as those in rural areas that compete for employees with hospitals in nearby urban areas, the statute permits a hospital to seek reclassification from its geographically-based wage area to a nearby wage area for payment purposes if it meets certain criteria. St. Michael's Med. Ctr. v. Sebelius, 648 F Supp. 2d 18, 20 n.3, 21 (D.D.C. 2009) (citing 42 U.S.C. § 1395ww(d)(8)(B)(i) and Robert Wood Johnson Hosp. v. Thompson, 297 F.3d 273, 276 (3d Cir. 2002)).

The statute further directs the Secretary to publish guidelines to be used by the Review Board in rendering decisions on applications for reclassification, including guidelines "for determining whether the county in which the hospital is located should be treated as being part of a particular Metropolitan Statistical Area." 42 U.S.C. § 1395ww(d)(10)(D)(i)(II). A hospital seeking a change in geographic classification must submit its application to the Review Board "not later than the first day of the 13-month period ending on September 30 of the preceding fiscal year." Id. § 1395ww(d)(10)(C)(ii). The Review Board must then render a decision on the application no later than 180 days after the deadline. Id. § 1395ww(d)(10)(C)(iii). Once the Review Board renders a decision to reclassify a hospital based upon its application for such reclassification, that "decision of the Board to reclassify" the hospital "shall be effective for a period of 3 fiscal years." Id. § 1395ww(d)(10)(D)(v).

Notably, the mandatory language of "shall" in this last provision—the Three-Year Reclassification Decision Provision—speaks only to the "decision of the Board to reclassify a subsection (d) hospital" to a new geographic classification. That language protects hospitals from

a subsequent reclassification action by the Review Board or the Secretary within a three-year period. Under a plain reading of the Provision's language, it does not apply to any decision by the Secretary to redefine what those geographic areas encompass and, in turn, does not address the resulting impact on a hospital's eligibility to remain within a particular geographic area.

Indeed, the Three-Year Reclassification Decision Provision, enacted after § 1395ww(d)(3)(E), is silent on any limitation on the Secretary's authority to redefine geographic areas. Section 1395ww(d)(3)(E)(i) provides that the Secretary "shall adjust the proportion . . . of hospitals' costs which are attributable to wages and wage-related costs, of the [diagnosis-related group] prospective payments rate . . . for area differences in hospital wages by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." Id. Under this provision, the Secretary's task "is unambiguous: to calculate a factor that reflects geographic-area wage-level differences, and nothing else." Bellevue Hosp. Ctr. v. Leavitt, 443 F.3d 163, 174 (2d Cir. 2006). However, the statute "leaves considerable ambiguity as to the term 'geographic area.'" Id. The agency has broad discretion in defining those geographic areas when balancing the need to make geographic areas small enough to actually reflect differences in wage levels against the need to include enough hospitals to meaningfully average costs. Id. Although the use of OMB delineations is not mandated by Congress, the voluntary adoption of OMB's geographic delineations has been approved by Congress and has been deemed reasonable as a means for the Secretary to fulfill its statutory duties to adjust Medicare reimbursements to reflect differences in wage levels. Id; 85 Fed. Reg. 58,745; 42 U.S.C. § 1395ww(d)(10)(D)(ii). Had the subsequently-enacted Three-Year Reclassification Decision Provision intended to limit the use of such broad authority in a manner that would not affect individualized reclassification decisions, it could have done so.

Moreover, reading the Three-Year Reclassification Decision Provision to encompass a limitation on the Secretary's power to establish and define geographic areas would make little sense. Under § 1395ww(d)(3)(E), the Secretary defines or redefines geographic areas that are applicable for wage index purposes for all hospitals. Reclassification decisions under § 1395ww(d)(10)(C), however, are individualized decisions that apply to the specific hospital or group of hospitals seeking reclassification. It would be illogical for Congress to suggest that the Secretary has the authority to define geographic areas, yet mandate that certain individual hospitals are excepted from those generally-applicable definitions due to the existence of a reclassification decision made within a three-year period of that definition.

Applying this interpretation, I find that Congress did not convey any express intention on the issue before me. When Temple applied for reclassification to the New York-Jersey City-White Plains, NY-NJ Statistical Area 35614, on September 3, 2019, OMB had already, in 2018, updated definitions and geographic boundaries of certain Statistical Areas including altering the New York-Jersey City-White Plains, NY-NJ Statistical Area 35614 by removing three of its constituent counties (Middlesex County, NJ; Monmouth County, NJ; and Ocean County, NJ), and combining them with a fourth county (Somerset County, NJ) to create a newly-constituted New Brunswick-Lakewood Statistical Area 35154. After Temple's requested reclassification was approved, the Secretary adopted the 2018 OMB changes, including the elimination of the precise Statistical Area to which Temple was reclassified and the creation of the New Brunswick-Lakewood Statistical Area 35154. Thus, although the reclassification decision remained in place, the Secretary's adoption of the OMB changes rendered the basis for and the effectuation of that decision impossible. Temple had to be reclassified somewhere. Nothing in Congress' drafting of the

Medicare statute—and more specifically, in the Three-Year Reclassification Decision Provision—clearly and unambiguously addressed this scenario.

Temple attempts to satisfy step one of the <u>Chevron</u> analysis by relying on <u>Geisinger Community Medical Center v. Secretary United States Department of Health & Human Services</u>, 794 F.3d 383 (3d Cir. 2015). Temple cites <u>Geisinger</u> for the proposition that the Secretary cannot override the specific statutory mandate of the Three-Year Reclassification Decision Provision. That case, however, involved an entirely separate provision of the Medicare statute, Section 401, which allows hospitals located in urban areas to be treated as hospitals located in rural areas for the purposes of determining, among other things, inpatient reimbursement. <u>Id.</u> at 387–88. Section 401 provided that a hospital in an urban area that satisfies certain criteria and submits an appropriate application "shall" be treated as located in the rural area of the State in which the hospital is located. <u>Id.</u> at 388. The Secretary was concerned that the statute would allow some hospitals, claiming to be disadvantaged by their urban status, to be reclassified as rural under Section 401 and thereby receive the benefits afforded to rural hospitals, and then subsequently claim disadvantage from that rural status and seek reclassification through the Review Board back to the urban area for purposes of their standardized amount and wage index. <u>Id.</u> at 388–89. As such, the Secretary issued the Reclassification Rule, which precluded a hospital with Section 401 status from being reclassified to a different wage index area for any year the hospital maintains that Section 401 status, unless the hospital cancelled its Section 401 designation. <u>Id.</u> at 389.

On a challenge to the legality of the Reclassification Rule, the Third Circuit defined the issue as "whether the Secretary is required to treat hospitals with Section 401 status like hospitals physically located in rural areas for purposes of Board reclassification." <u>Id.</u> at 391. The Court found that, based on the plain language of the statute, Congress had "unambiguously expressed its

intent that the Secretary shall do so." Id. It reasoned that Section 401 began with the phrase "[f]or purposes of this subsection," meaning that Section 401 governed everywhere a hospital's rural status is relevant, i.e. all of subsection (d) including section (d)(10) involving reclassification. Id. at 392–93. In turn, the Third Circuit read Section 401 as mandating that "for purposes of Board reclassification, which is inextricably intertwined with a hospital's rural or urban designation, the Board shall treat the hospital as rural." Id. at 393. The Court concluded that the Reclassification Rule—prohibiting section 401 hospitals from seeking reclassification under subsection (d)(10)— was contrary to Congress' express intent. Id. at 395.

Notably, Geisinger focused on the Rural Reclassification Provision of 42 U.S.C. § 1395ww(d)(8)(E), a provision not at issue in this case. Geisinger did not address the Secretary's exercise of authority under § 1395ww(d)(3)(E) to adopt OMB's modified geographic delineations. That fact, standing alone, renders Geisinger irrelevant to my inquiry here. Moreover, unlike Section 401, which included language making it applicable "for purposes of this subsection," and therefore all of § 1395ww(d), the Three-Year Reclassification Decision Provision contains no such broad language making it applicable beyond its specified purpose. Accordingly, I find Geisinger inapposite to the present case.

In sum, I disagree that, under a plain interpretation of the statute, Congress had the precise intention to use the Three-Year Reclassification Decision Provision to limit the Secretary's authority to redefine the geographical boundaries of Statistical Areas for purposes of Medicare reimbursement. In turn, I deem 42 U.S.C. § 1395ww(d)(10)(D)(v) ambiguous and will proceed to the second step of the Chevron analysis.

## B.     Step Two of the *Chevron* Analysis

Temple argues that even proceeding under step two of <u>Chevron</u>, the Secretary's regulations and policies are invalid because they are "arbitrary, capricious, or manifestly contrary to the 3-Year Reclassification Decision Statute."  (Temple's Mot. Summ. J. 18.)

At step two, a court considers whether the agency's regulation that fills a statutory gap is "based on a permissible construction of the statute."  <u>Chevron</u>, 467 U.S. at 843.  "We must still at this stage consider the plain language of the statute, along with its origin and purpose, in reviewing the reasonableness of the regulation, . . . but if the regulation reflects a reasonable statutory interpretation, we will defer to that construction, even if we may have interpreted the statute otherwise."  <u>Helen Mining Co. v. Elliott</u>, 859 F.3d 226, 237 (3d Cir. 2017) (internal citation omitted).  Notably, the court does "not ask whether it is the best possible interpretation of Congress's ambiguous language.  Instead, [the court] extend[s] considerable deference to the agency and inquire[s] only whether it made 'a reasonable policy choice' in reaching its interpretation."  <u>Am. Farm Bureau Fed. v. U.S. E.P.A.</u>, 792 F.3d 281, 295 (3d Cir. 2015) (quotation omitted), <u>cert. denied</u>, 136 S. Ct. 1246 (2016).

Temple asserts that the Secretary was not required to adopt revised OMB delineations now and is not obligated to use OMB delineations at all.  Yet, Temple points out that the Secretary chose to implement new OMB delineations outside the decennial census process, resulting in great detriment to hospitals who were approved for reclassifications to areas affected by the new delineations and who believed those reclassifications were good for three years.  Temple contends that the Secretary needs compelling reasons to deviate from that outcome, and no compelling reasons exist here.  It concludes that "the question is one of the timing of implementing changes, not whether changes can ever be implemented."  (Temple's Resp. Opp'n Summ. J. 11.)

18

For several reasons, I disagree with Temple's argument and find that the Secretary's rulemaking was not arbitrary and capricious.  First, Temple's challenge to the timing of the Secretary's implementation of the geographic changes is misplaced.  Within any given Fiscal Year, a hospital may seek reclassification to a new Statistical Area.  As such, regardless of when the Secretary adopts geographic redefinitions, some hospital's reclassification decision will likely be affected.  Under Temple's logic, Statistical Areas could never be redefined if any hospital's reclassification would be inconsistent with the newly-defined geographical limitations within three years of that reclassification decision.  However, in establishing the Review Board and empowering it to decide whether to grant a hospital's request to change its geographic classification, Congress explicitly instructed the Secretary to ensure that the geographic reclassifications are budget neutral to assure that any reclassifications "do not result in aggregate payments . . . that are greater or less than those that would otherwise be made" across the inpatient prospective payment system.  42 U.S.C. § 1395ww(d)(8)(D).  Thus, the Secretary's adoption of OMB geographical delineations without regard for the timing of any individual hospital's circumstances or reclassification is a reasonable application of Congress' goals in enacting the statutory scheme at issue.

Second, I conclude that the Secretary's actions were consistent with the entirety of the scheme defined by Congress.  Once the Secretary adopted the new geographic classifications, the Secretary had to balance the existing reclassification decisions for individual hospitals against the mandate that, for a hospital to be redesignated to another area, it must demonstrate a close proximity to the area to which it sought redesignation.  42 C.F.R. § 412.230(a)(2).  To disregard the latter mandate in the interest of maintaining certain reclassification decisions for a period of three years would mean that some hospitals' classifications would fall within the currently

19

applicable geographic delineations, while other hospitals would be classified in Statistical Areas that either no longer existed or for which the hospitals no longer met the proximity requirements.

To avoid creating such discrepancies, the Secretary opted to assign each affected hospital's reclassifications to the Statistical Area (under the newly revised OMB delineations) containing the nearest county located (1) outside of the hospital's geographic area and (2) within the extinguished Statistical Area, as previously configured, to which it has an approved reclassification.  See FY 2021 IPPS Final Rule, 85 Fed. Reg. 58,432, 58771.[6]  The Secretary went on to explain how this proposal remained consistent with Congress' intent:

> [W]e believe assigning reclassifications to the [Statistical Area] that contains the nearest county that meets the aforementioned criteria satisfies the statutory requirement at section 1886(d)(10)(v) of the Act by maintaining reclassification status for a period of 3 fiscal years, while generally respecting the longstanding principle of geographic proximity in the labor market reclassification process.

Id. at 58,772.  Ultimately, such a policy means that all hospitals classified to a specific Statistical Area will meet regulatory proximity requirements instead of having disparate treatment of different hospitals depending on whether a hospital has a reclassification decision and when that decision was made.  Any such reclassification, however, remains intact for a period of three years.  Such rulemaking constitutes a "reasonable policy choice" in interpreting Congress' intent.  Am. Farm Bureau, 792 F.3d at 295.

---

[6]     As noted above, this Final Rule stated: "Therefore, to maintain the integrity of a hospital's 3-year reclassification period, we proposed that current geographic reclassifications (applications approved effective for FY 2019, FY 2020, or FY 2021) that would be affected by [Statistical Areas] that are split apart or counties that shift to another [Statistical Area] under the revised OMB delineations, would ultimately be assigned to a [Statistical Area] under the revised OMB delineations that contains at least one county from the reclassified [Statistical Area] under the current FY 2020 definitions, and would be generally consistent with rules that govern geographic reclassification."  Id.

Third, although the Secretary's policy is neutrally applied to all affected hospitals, without regard to any benefit or harm to a particular hospital, the Secretary recognized the potential economic effects of the reclassification reassignment policy. The Secretary noted that "for hospitals that are reclassified to [Statistical Areas] that would split apart or to counties that would shift to another [Statistical Area] under the revised OMB delineations[, the policy] may result in the reassignment of the hospital for the remainder of its 3-year reclassification period to a [Statistical Area] having a lower wage index than the wage index that would have been assigned for the reclassified hospital in the absence of the adoption of the revised OMB delineations." 85 Fed. Reg. 58,432, 58,772. Therefore, the Secretary adopted several mitigating measures, including a five percent cap on any decrease in a hospital's wage index from the hospital's final wage index for the prior fiscal year in order to ease significant negative payments for Fiscal Year 2021 and afford hospitals adequate time to fully assess any additional reclassification options available to them. Id. In addition, The Secretary proposed that affected hospitals could submit a request to the Centers for Medicare & Medicaid Services to be reassigned to a different Statistical Area, so long as the requested Statistical Area contains a county that was part of the original Statistical Area to which the hospital was reclassified. Id. at 58,774.

Temple could not take advantage of the first measure because its original reclassification to the New York-Jersey City-White Plains, NY-NJ Statistical Area had not yet gone into effect, meaning that its final wage index for the prior fiscal year did not reflect what it expected to receive from its reclassification decision. Temple is currently seeking reclassification to a different Statistical Area, although it posits that it will still be subject to a lower wage index than the one it expected for Fiscal Year 2021. Such a detrimental impact, while unfortunate, cannot factor into the analysis under step two of Chevron. See Universal Health Servs. of McAllen, Inc. Subsidiary

21

of Universal Health Servs., Inc. v. Sullivan, 770 F. Supp. 704, 719 (D.D.C. 1991) ("The Court will not strike down this otherwise reasonable guideline because it, unfortunately, disadvantages one provider of services.")  Rather, I must remain "mindful that the Secretary's statutory duties include administration of the entire Medicare program, which necessarily involves policy choices and resource allocations."  Id.  In other words, the fact that Temple will now obtain a lower rate on Medicare reimbursement than it expected for three years starting in Fiscal Year 2021 does not render the Secretary's policy arbitrary and capricious.

Finally, as the Third Circuit has recognized, although the proper bounds of Chevron deference remain ill-defined, "there remains a general consensus that such deference is appropriate where the agency oversees a "complex and highly technical" regulatory program.  Helen Mining Co. v. Elliott, 859 F.3d 226, 238 (3d Cir. 2017); see also Mercy Home Health v. Leavitt, 436 F.3d 370, 377 (3d Cir. 2006) (holding that substantial deference to an agency's interpretation of its own regulations "is particularly appropriate in contexts that involve a 'complex and highly technical regulatory program, such as Medicare, which requires significant expertise and entail[s] the exercise of judgment grounded in policy concerns.'") (quoting Thomas Jefferson Univ. Hosp. v. Shalala, 512 U.S. 504, 512 (1994)).  With that deference in mind, I cannot prioritize Temple's individualized interest in ensuring its classification to the highest possible wage index over the Secretary's broad mandate to develop policies that fairly and evenhandedly determine how to classify hospitals under current definitions of Statistical Areas.  Accordingly, under step two of Chevron, I find that the Secretary made a "reasonable policy choice" in  reaching an interpretation of the statutory scheme at issue.

## IV. CONCLUSION

For all of the foregoing reasons, I conclude that the Secretary's reclassification assignment policy was a reasonable and lawful exercise of the Secretary's rulemaking power. As such, I will grant summary judgment in favor of the Secretary and against Temple. An appropriate Order follows.